UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-22563-CIV-ALTONAGA/Reid

**REINSURANCE PARTNERS INVESTMENTS**, *et al.*,

 Plaintiffs,
v.

**MAITE, LLC**; *et al.*,

 Defendants.
_____/

## ORDER

**THIS CAUSE** came before the Court upon Plaintiff/Counter-Defendant, 530 Mashta, LLC's ("Mashta['s]") Motion to Dismiss Maite's Amended Counterclaim [ECF No. 44], filed on November 6, 2024. Defendant/Counter-Plaintiff, Maite, LLC filed a Response [ECF No. 49], to which Mashta filed a Reply [ECF No. 52]. The Court has carefully considered Maite's Amended Counterclaim [ECF No. 38] and its attachments; the parties' written submissions; and applicable law. For the following reasons, the Motion is denied.

## I. BACKGROUND

Mashta and Plaintiff, Tri-Cap Holdings, LLC initiated this suit against Defendants, Robert M. Koffler, Maite, and RMK Ngena, LLC on July 26, 2024. (*See Tri-Cap Holdings, LLC v. Koffler*, No. 24-cv-22865, Compl. [ECF No. 1] filed July 26, 2024 (S.D. Fla. 2024)).[1] Maite filed its Amended Counterclaim, against Mashta alone, on October 23, 2024. (*See generally* Am. Countercl.). The case arises from a tortured business relationship between the parties and a subsequent dispute over a large, purportedly over-due debt. (*See generally id.*).

---

[1] This case was originally filed under case number 24-cv-22865; the Court consolidated that case and the above-captioned case on September 6, 2024. (*See generally* Sept. 6, 2024 Order [ECF No. 28]).

"Koffler was the sole founder, Chairman, and CEO of Lera Investment Technologies, Inc. ('LIT') since its inception in 2013 until 2023[.]"[2] (*Id.* ¶ 12 (alteration added)). Maite describes him as "the visionary 'working partner' at LIT." (*Id.* ¶ 23). Camilo Montana, via Mashta, and Gabriel Holschneider, via Tri-Cap, became members of LIT in 2016; and, along with Koffler, via Maite, were the controlling shareholders of the company from 2016 to 2023.[3] (*See id.* ¶¶ 20–22). The three shareholders "kept the same percentage interest in LIT while maintaining a separate tally of complex interpersonal or intercorporate loans." (*Id.* ¶ 24). Montana and Holschneider, via Mashta and Tri-Cap, allegedly loaned millions of dollars to Maite and Koffler with the understanding that "Koffler did not have and would never have the ability to repay the loans . . . other than through the envisioned and reasonably expected success of LIT and Maite's percentage ownership of LIT." (*Id.* ¶ 25 (alteration added)).

This system of loans was going to be halted after three years, and the shareholders would arrive at a balance at such time. (*See id.* ¶ 26). According to Maite, this plan was abandoned because "Montana and Holschneider[] were not completely free agents in charge of the funds that they had invested" and lent. (*Id.* ¶ 27 (alteration added)). Montana and Holschneider allegedly were "forced" to push Koffler and Maite into executing two Debt Acknowledgement Agreements in September 2022 and a Forbearance Agreement on April 1, 2023. (*Id.*). Despite concededly signing the Debt Acknowledgement Agreements and the Forbearance Agreement, "both Montana and Holschneider promised and reassured Koffler that they would never implement or exercise the terms of the Debt Acknowledgement Agreement, and . . . , they would never allow such documents to be exercised against Koffler and Maite." (*Id.* ¶ 31 (alteration added)).

---

[2] "LIT is a very valuable and important financial/technology company that has developed a unique business offering to deliver technology as a service to major companies around the world." (Am. Countercl. ¶ 13).

[3] In 2023, LIT received institutional funding. (*See* Am. Countercl. ¶ 16).

In October 2023, Koffler, Montana, and Holschneider met with LIT's accountants and reached what Maite terms the "Settlement Agreement." (*Id.* ¶ 35; *see also id.* ¶¶ 34–38). The Settlement Agreement "consisted of the effective novation of all of [Koffler, Montana, and Holschneider's] interpersonal and intercorporate transactions . . . in exchange for the formation of a new limited liability company[.]" (*Id.* ¶ 35 (alterations added)). The Settlement Agreement "further mapped a clear path and . . . a three-year time frame for Koffler to pay the monies he owed [Montana and Holschneider] while collateralizing all his debt with his two partners with the LIT shares." (*Id.* ¶ 36 (alterations added)). In exchange for the Settlement Agreement, "Koffler and Maite promised the other LIT Shareholders that they would commit to take, oversee, and complete the immediate short-term resolution of an existential tripartite contractual issue that LIT was having with two of its three most significant and important clients/partners: Santander Bank and Accenture." (*Id.* ¶ 37).

To implement the Settlement Agreement, Maite allegedly took two actions. First, "Koffler and Maite made an agreement with Holschneider and Tri-Cap that . . . Maite's shares in LIT would include the payment of Tri-Cap's debt to Mashta." (*Id.* ¶ 40 (alteration added)). In exchange, Tri-Cap and Holschneider forgave any debt Maite and Koffler had with them.[4] (*See id.*). Second, "Koffler, through Maite, contributed virtually all his LIT[] stock (approximately 99%), into" a new company, called El Gran Pote, LLC. (*Id.* ¶ 39 (alteration added)). Koffler signed the Amended and Restated Operating Agreement of El Gran Pote ("Operating Agreement") on November 20, 2023. (*See id.*; *see also id.*, Ex. 1, Operating Agreement [ECF No. 38] 21–35).

Maite claims that "Mashta fraudulently induced Koffler and Maite to transfer millions of dollars [sic] worth of Maite's shares of LIT, without consideration to Montana and Mashta, by

---

[4] "This was because the debt that Holschneider and Tri-Cap had with Mashta and Montana was reasonably equivalent to the money that Maite and Koffler owed Tri-Cap and Holschneider." (Am. Countercl. ¶ 40).

3

assigning Maite's membership interest to the new El Gran Pote to Mashta." (*Id.* ¶ 42). Montana, Koffler, and Holschneider allegedly had an extensive WhatsApp group voice call on November 27, 2023, during which Montana told Koffler that he needed proof that Mashta owned the LIT stock to avoid foreclosure on Montana's home. (*See id.* ¶ 46). Montana purportedly promised Koffler that he would "undo and void" the assignment in a few months when Montana's foreclosure issues resolved. (*Id.*).

Maite alleges these were lies to induce it to assign its shares without due consideration. (*See id.* ¶¶ 47–48). Per the Operating Agreement, "Maite would be entitled to the fair market value of its percentage interest upon its disassociation from Gran Pote" when it assigned its shares to Mashta. (*Id.* ¶ 44). Rather than a fair-market valuation of its shares, Maite alleges that "Mashta converted Maite's and Koffler's stock in LIT in violation of the Operating Agreement without giving Maite and Koffler any consideration whatsoever for the value of these shares[.]" (*Id.* ¶ 45 (alteration added)).

Maite brings two counterclaims against Mashta: one, a counterclaim of recission of the assignment of its shares based on fraudulent inducement (*see id.* ¶¶ 49–65); and two, an alternative counterclaim of breach of the Operating Agreement (*see id.* ¶¶ 66–74). Mashta moves to dismiss the Amended Counterclaim in its entirety for failing to state claims for relief under Federal Rule of Civil Procedure 12(b)(6). (*See generally* Mot.).

## II. LEGAL STANDARD

"A motion to dismiss a counterclaim under [Federal] Rule [of Civil Procedure] 12(b)(6) is treated the same as a motion to dismiss a complaint." *Fabricant v. Sears Roebuck*, 202 F.R.D. 306, 308 (S.D. Fla. 2001) (alterations added; citation omitted). "To survive a motion to dismiss [under Rule 12(b)(6)], a [counterclaim] must contain sufficient factual matter, accepted as true, to

4

'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alterations added; quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (alteration added; quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555 (alteration added; citation omitted). "A [counterclaim] is plausible on its face when it contains sufficient facts to support a reasonable inference that the defendant is liable for the misconduct alleged." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (alteration added; citing *Iqbal*, 556 U.S. at 678).

When considering a motion to dismiss under Rule 12(b)(6), a court must construe the counterclaim in the light most favorable to the defendant/counter-plaintiff and take its factual allegations as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)). Additionally, the court considers not only the allegations in the counterclaim but also any exhibits attached to or incorporated by reference within it. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

### III. DISCUSSION

Mashta argues the Amended Counterclaim should be dismissed for five reasons: (1) the Counterclaim fails to establish a valid oral agreement; (2) even if the Counterclaim establishes an oral agreement, Florida's statutes of fraud bar enforcement of the oral agreement; (3) Maite fails to plead the elements required to state a counterclaim for recission; (4) Florida's independent tort doctrine bars Maite's recission counterclaim; and (5) Maite fails to state a counterclaim for breach

of the Operating Agreement because the terms of the Agreement contradict the counterclaim. (*See generally* Mot.). The Court addresses each argument in turn.

**Oral Agreement.** Mashta argues that both counts of the Amended Counterclaim "are based on the alleged oral Settlement Agreement." (*Id.* 7). According to Maite, its counterclaims are not based on an oral contract. (*See* Resp. 6).

To be sure, the oral Settlement Agreement plays a large role in the background of the Operating Agreement's formation. (*See generally* Am. Countercl.). Mashta argues this means the "crux of Maite's Amended Counterclaim is . . . the alleged [oral] Settlement Agreement[,]" and the Court must evaluate the sufficiency of the alleged oral agreement at this stage. (Mot. 7 (alterations added)). Again, on a motion to dismiss, "the [c]ourt takes the allegations in the counterclaim as true and construes the allegations in the light most favorable to" Maite. *Nicopior v. Moshi Moshi Palm Grove, LLC*, 375 F. Supp. 3d 1278, 1282 (S.D. Fla. 2019) (alteration added; citation and quotation marks omitted). Maite asserts its counterclaims are based on the Operating Agreement, not the alleged oral agreement. (*See generally* Am. Countercl.). At this stage, the Court declines Mashta's invitation to delve below what the Amended Counterclaim pleads — claims predicated on the Operating Agreement — to evaluate the oral Settlement Agreement.

**Statutes of Fraud.** Mashta next argues that "Florida's general Statue [sic] of Frauds (Florida Statute [section] 725.01) and its banking Statute of Frauds (Florida Statute [section] 687.0304) bar enforcement of the oral Settlement Agreement[.]" (Mot. 9 (alterations added)). To repeat, however, the Court takes Maite's counterclaims at their face — as counterclaims based on the Operating Agreement, which is undisputedly a written contract. (*See* Mot. 7; Resp. 6; Reply 3–4). Thus, the statutes-of-fraud arguments are inapplicable. *See, e.g.*, *Topp, Inc. v. Uniden Am. Corp.*, 483 F. Supp. 2d 1187, 1205 (S.D. Fla. 2007) ("Oral agreements of the type alleged by [the

6

plaintiff] are barred by the Statute of Frauds *in the absence of a writing* which is sufficient to evidence the existence of an agreement." (alteration and emphasis added)).

**Recission Counterclaim.**  Turning to Mashta's next argument, Mashta contends Maite fails to state a counterclaim entitling it to recission of the assignment. (*See* Mot. 10–14).  Under Florida law, Maite must plead six factors to state a counterclaim of recission:

> (1) the character or relationship of the parties; (2) the making of the contract; (3) the existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation; (4) that the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission; (5) if the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible; and (6) lastly, that the moving party has no adequate remedy at law.

*Barber v. Am.'s Wholesale Lender*, 542 F. App'x 832, 836 (11th Cir. 2013) (alterations adopted; quoting *Billian v. Mobil Corp.*, 710 So. 2d 984, 991 (Fla. 4th DCA 1998)).

First, Mashta makes an overarching argument that "recission of *only* the assignment or the Operating Agreement is improper, because it seeks only rescission of part of the entire alleged oral Settlement Agreement." (Mot. 11 (emphasis in original)).  This argument fails to persuade.  In the Amended Counterclaim, Maite requests recission of the assignment of its shares. (*See, e.g.*, Am. Countercl. ¶¶ 60–65).  Again, "[t]he Court takes the allegations in the counterclaim as true and construes the allegations in the light most favorable to" Maite.  *Nicopior*, 375 F. Supp. 3d at 1282 (alteration added; citation and quotation marks omitted).  The Court accepts as true that Maite seeks recission of the assignment in its entirety.

To the extent Mashta challenges the interpretation of the Operating Agreement or suggests that the oral Settlement Agreement is incorporated into the Operating Agreement, such an issue is inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).  "The Court has no obligation to consider the terms of the [a]greement in ruling on the [m]otion to [d]ismiss, and it

7

declines to interpret or analyze the [a]greement's terms at this stage." *SCCY Indus., LLC v. Jannuzzo*, No. 17-cv-1495, 2018 WL 3657570, at *4 (M.D. Fla. Aug. 2, 2018) (alterations added).

Mashta also challenges Maite's ability to plead the requisite elements of a recission counterclaim. To begin, Mashta argues the Settlement Agreement was not a valid contract, so Maite fails to assert the making of a contract. (*See* Mot. 11). As explained, the Court is unconvinced by this argument; Maite alleges the contract at issue was the Operating Agreement, not the Settlement Agreement.

Mashta then states that Maite's recission counterclaim fails because Maite does not state a counterclaim for fraudulent inducement. (*See* Mot. 11–13). Under Florida law, a counterclaim for fraud in the inducement requires Maite to plead: (1) Mashta made "a false statement concerning a material fact;" (2) Mashta either "knew or should have known that the representation was false;" (3) Mashta "intended to induce" Maite "to act in reliance on the false statement;" and (4) Maite "acted in reliance on the representation and was injured as a result." *SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 798 (11th Cir. 2005) (citing *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985)). "Fraudulent inducement claims are subject to Rule 9(b)'s heightened pleading standard." *CMS Distrib. Ltd. v. Crown Cell Inc.*, No. 20-24846-Civ, 2021 WL 2661512, at *3 (S.D. Fla. Mar. 24, 2021) (citation omitted).

Taking Maite's allegations as true, and construing inferences in its favor, Maite plausibly alleges a fraudulent inducement counterclaim. Maite alleges Mashta, via Montana, made a false representation regarding the assignment; Montana knew the representation was false and intended Maite, via Koeffler, to rely on it; and, finally, Maite did in fact rely on it. (*See* Am. Countercl. ¶¶ 54–57). Maite also satisfies Rule 9(b), as it alleges "the who, what, when[,] where, and how" of the alleged fraud, stating Montana made false allegations on or around November 27, 2023

8

during a specific phone call. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (alteration added; citation and quotation marks omitted); (*see also* Am. Countercl. ¶ 46). This is sufficient to plead fraudulent inducement.

Further, Mashta contends that Maite fails to allege that it rescinded the oral Settlement Agreement. (*See* Mot. 13). The Court quickly disposes of this argument, for Maite asserts it is referring to the assignment of its shares, not the Settlement Agreement; and Maite "notified Mashta that the [a]ssignment is null and void." (Am. Countercl. ¶ 62 (alteration added)). Time will tell whether Maite can produce proof to bear out these allegations, but a Rule 12(b)(6) motion is not concerned with proof.

In its final bid to have the Court dismiss the rescission counterclaim, Mashta states, "Maite fails to plead that it has returned or is able to return the parties to their status quo[.]" (Mot. 13 (alteration added)). But Maite alleges it has "received no benefits from the [a]ssignment[,]" can restore nothing to Mashta, and "has no adequate remedy at law to the recission of the [a]ssignment[.]" (Am. Countercl. ¶¶ 63–65). Thus, Maite adequately pleads a recission counterclaim.

**Independent Tort Doctrine.** Mashta next argues that Florida's independent tort doctrine bars Maite from bringing the breach-of-contract and recission counterclaims together. (*See* Mot. 14–15). Under Florida's independent tort doctrine, "a party to a contract can recover economic loss in tort against the other contracting party only when there is additional, wrongful conduct chargeable to that party [that] amounts to a tort independent and separate from the claimed contract breach." *Tiara Condo. Ass'n, Inc. v. Marsh, USA, Inc.*, 991 F. Supp. 2d 1271, 1279 (S.D. Fla. 2014) (alteration added; citations omitted). Thus, parties "may not recast causes of action that are otherwise breach-of-contract claims as tort claims." *Costanza Y Cruz Medina v. Scottsdale Ins.*

*Co.*, No. 22-23774-Civ, 2023 WL 11801301, at *4 (S.D. Fla. March 7, 2023) (alterations added; quoting *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1353 (S.D. Fla. 2021)). The doctrine's impetus stems from "[f]undamental contractual principles . . . [that] bar a tort claim where the offending party has committed no breach of duty independent of a breach of its contractual obligations." *Freeman v. Sharpe Res. Corp.*, No. 12-cv-1584, 2013 WL 2151723, at *8 (M.D. Fla. May 16, 2013) (alterations added; citing *Tiara*, 110 So. 3d at 408).

When analyzing application of Florida's independent tort doctrine in cases involving misrepresentations, the key consideration is whether "such misrepresentations are interwoven and indistinct from the heart of the contractual agreement." *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1223 (11th Cir. 2018) (quotation marks and citations omitted). If the alleged fraud is not "separate and apart from the performance of the contract[,]" the claims are barred under the independent tort doctrine. *Spears v. SHK Consulting & Dev., Inc.*, 338 F. Supp. 3d 1272, 1279 (M.D. Fla. 2018) (alteration added; quotation marks and citations omitted).

Mashta attempts to characterize Maite's counterclaims as a single claim, parading as two. (*See* Mot. 14). According to Mashta, Maite's breach-of-contract counterclaim is predicated on Mashta's failure to appraise and compensate Maite fairly for assignment of the shares (*see id.*); Mashta asks the Court to juxtapose this counterclaim with Maite's recission counterclaim, which, in Mashta's view, hinges on the same alleged manipulation — Mashta's failure to appraise and fairly compensate Maite for the shares (*see id.*). Under Mashta's depiction, Maite alleges two counterclaims with the same facts and injury, in direct violation of Florida's independent tort doctrine. (*See id.*).

Maite's characterization of its two counterclaims is markedly different. Maite explains that, while its breach-of-contract counterclaim *is* centered on the failure to appraise and

10

compensate Maite for the shares, the recission counterclaim is based on Mashta's *manipulation* that forced Maite's unknowing and permanent dissociation from Gran Pote. (*See* Resp. 12–13).

Maite's recission counterclaim is based on independent conduct: Mashta's (alleged) lies that the assignment would only be temporary. (*See* Am. Countercl. ¶¶ 46–48, 54–57). The recission counterclaim introduces essential extracontractual facts, which will eventually require an analysis beyond the Operating Agreement's terms. The Court's conclusion that the recission counterclaim is separate from the breach-of-contract counterclaim aligns with the consensus that fraudulent inducement is typically "a tort independent from a breach of contract because it requires [defendants] to prove facts separate and distinct from the facts necessary to prove the breach of contract." *Cuhaci v. Kouri Grp., LP*, No. 20-cv-23950, 2021 WL 2290685, at * 7 (S.D. Fla. June 4, 2021) (alteration added; quotation marks omitted; quoting *Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, No. 13-61687-Civ, 2014 WL 2215770, at *5 (S.D. Fla. May 9, 2014)).

For example, in *Cuhaci*, the court found the plaintiff's claims did not violate Florida's independent tort doctrine where the defendants misrepresented their intent to be bound by the agreement both prior to and during the agreement's execution, requiring the plaintiff to prove statements of misrepresentation. 2021 WL 2290685, at *7. The court in *Cuhaci* further reasoned that the claims were separate because "to the extent" the breach-of-contract claim was denied, the plaintiff "may still prevail on his alternative claim[.]" *Id.* (alteration added).

Here, too, if the provisions of the contract do not align with Maite's interpretation, and the assignment does not require valuation and consideration, Maite could still attempt to recover on the recission counterclaim for its alleged wrongful loss of membership in Gran Pote.[5] (*See* Resp.

---

[5] Of course, courts *do* sometimes find fraud and misrepresentation claims to be intertwined with breach-of-contract claims. Yet, those factual instances are dissimilar from the instant case. For example, in *Costanza Y Cruz Medina v. Scottsdale Insurance Company*, the court found multiple claims to be overlapping because the defendant's alleged false statements were "*about coverage*, . . . merely restating the terms of the

14). *See also Precision Wellness, LLC v. Demetech Corp.*, No. 22-cv-20976, 2023 WL 5448038, at * 5 (S.D. Fla. Aug. 24, 2023) (finding the plaintiff's claims did not violate Florida's independent tort doctrine because defendants fraudulently induced plaintiff to enter a *separate* contract). As explained, Maite's breach-of-contract counterclaim and recission counterclaim for fraud in the inducement do not run afoul of Florida's independent tort doctrine.

***Breach-of-Contract Counterclaim.*** Mashta further argues that Maite's breach-of-contract counterclaim must be dismissed because "the Operating Agreement contained no requirement that Mashta appraise the value of Maite's assigned shares and pay Maite for the assignment." (Mot. 15). In response, Maite highlights the portions of the Operating Agreement that it reads to require appraisal of the assigned shares, insisting the Operating Agreement and the assignment, when read together or individually, require that Maite have been paid value for the transfer of its interest in Maite. (*See* Resp. 15). In other words, the parties disagree about interpretation of the contract.

In this last argument, Mashta asks the Court to analyze the terms of the Operating Agreement on a motion to dismiss. The Court declines the invitation to prematurely analyze the merits of the case, particularly because "[c]ourt[s] *may not* engage in contract interpretation at the motion[-]to[-]dismiss stage, as these arguments are more appropriate for summary judgment" or, where the facts are disputed, at trial. *Bordelon Marine, LLC v. ETRAC, Inc.*, 528 F. Supp. 3d 1280, 1286 (S.D. Fla. 2020) (alterations and emphasis added; quotation marks omitted; quoting *Geter v. Galardi S. Enters., Inc.*, 43 F. Supp. 3d 1322, 1328 (S.D. Fla. 2014)).

---

[p]olicy." 2023 WL 11801301, at *5 (alterations and emphasis added). *See also Merch. One, Inc. v. TLO, Inc.*, No. 19-cv-23719, 2020 WL 248608, at *4 (S.D. Fla. Jan. 16, 2020) (holding that the plaintiff could not bring multiple claims "premised upon the same core of allegations" when one of the claims included misrepresentation of the calculation of a charge demanded by the original contract itself). In the instant case, Mashta did not lie about interpretation of contract terms; instead, Mashta allegedly lied about its intentions to enforce the assignment, inducing Maite to sign the assignment — a *separate* agreement. (*See* Am. Countercl. ¶¶ 46–48).

Maite alleges that "[p]ursuant to the terms of the Operating Agreement, absent a written agreement to the contrary, the purchase price of one member's acquisition of another member's interest in Gran Pote is required to be at the fair market value of the selling member's percentage interest." (Am. Countercl. ¶ 68). Taking the allegation as true, Maite's counterclaims are sufficient to withstand a motion to dismiss. Admittedly, the duty to accept the facts in a complaint as true at the motion-to-dismiss stage does not require the Court to turn a blind eye to clear factual contradictions between general allegations in the pleading and its exhibits. *See Griffin Indus., Inc. v. Irvin*, 496 F. 3d 1189, 1205–06 (11th Cir. 2007). But Maite's breach-of-contract counterclaim contains no such factual contradictions. The cited paragraphs of the Operating Agreement do not obviously contradict the Amended Counterclaim. (*See* Operating Agreement ¶¶ 30–31, 37, 38–39).

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiff/Counter-Defendant, 530 Mashta LLC's Motion to Dismiss Maite's Amended Counterclaim **[ECF No. 44]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 26th day of December, 2024.

_____
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:   counsel of record